# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

**MICHAEL KAZMIERSKI,**
        **Plaintiff,**

    **v.**                           **Case No. 15-C-0059**

**BONAFIDE SAFE & LOCK, INC.,**
        **Defendant.**

_____

## DECISION AND ORDER

Michael Kazmierski alleges that Bonafide Safe & Lock, Inc., terminated his employment in violation of the Americans with Disabilities Act ("ADA"). Before me now is Bonafide's motion for summary judgment, and also the plaintiff's motion to strike Bonafide's response to the plaintiff's proposed findings of fact. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## I. BACKGROUND

The plaintiff began working for the defendant as a locksmith technician in 2004. His job primarily involved traveling to homes and businesses to service or install locks, doors, safes, bank vaults, and related security equipment. The defendant terminated the plaintiff's employment in August 2013. The decision to terminate the plaintiff's employment was made by Mike Egan, the president of the company. The plaintiff contends that he was terminated in violation of the ADA.

1

In the early 2000s, before the defendant hired him, the plaintiff was diagnosed with three herniated discs in his lower back. According to the plaintiff's evidence, he continues to suffer from back pain associated with the herniated discs and will occasionally experience flare-ups of back pain. For purposes of summary judgment, the defendant concedes that the plaintiff's herniated discs and the associated back pain qualify as a disabilities under the ADA.

In 2008, the plaintiff was diagnosed with chronic sinusitis. He continued to suffer from that condition throughout his employment with the defendant. The sinusitis flares up about two to four times each year and causes the plaintiff to experience sinus infections, cold- and flu-like symptoms, fluid build-up in his ears, headaches, and vertigo. Pl.'s Proposed Findings of Fact ("PFOF") ¶ 38. During flare-ups, the plaintiff will take prescribed antibiotics and steroids that significantly affect his ability to function. For purposes of summary judgment, the defendant concedes that the plaintiff's sinusitis qualifies as a disability under the ADA.

Also in 2008, the plaintiff suffered a heart attack. By the time Bonafide terminated the plaintiff's employment, he had recovered from the heart attack, and the plaintiff does not claim a heart condition as a disability. However, shortly after the heart attack, the plaintiff began suffering from anxiety attacks, which were triggered by stress and/or fear that he would experience another heart attack. In 2011, the plaintiff began seeing a psychiatrist and a therapist, and he was diagnosed with anxiety and depression and prescribed medication to treat those conditions. For purposes of summary judgment, the defendant concedes that the plaintiff's anxiety and depression qualify as disabilities under the ADA.

During the plaintiff's employment, the defendant provided him with five paid sick days every year. However, in the years preceding his termination, the plaintiff called in to work much more often than that. In 2011, the plaintiff took 16 unplanned sick days.[1] Def. PFOF ¶ 71. In 2012, he took 10 unplanned sick days. *Id.* ¶ 72. And in the first seven months of 2013, the plaintiff took 10 unplanned sick days. *Id.* ¶ 85. During these years, when the plaintiff ran out of his allotted five sick days, he used his vacation days and unpaid leave to make up the difference. At least some of the plaintiff's unplanned sick days were necessitated by flare-ups of the conditions that the plaintiff claims as disabilities under the ADA, *i.e.*, his herniated discs, sinusitis, anxiety, and depression. However, a large quantity of these unplanned sick days have no connection to these specific conditions. These sick days were used to deal with matters such as the flu, a cough, bronchitis, gastro-intestinal issues, eye pain, colitis, a dental emergency, and a vet emergency. *See* Def. PFOF ¶¶ 84, 86, 93, 100, 101, 103, 107.

Over the years, the defendant occasionally expressed to the plaintiff that it was unhappy with his attendance, although it did not formally discipline the plaintiff for absenteeism until he was terminated. The parties seem to agree that the plaintiff's attendance was satisfactory until at least 2008, when the plaintiff suffered his heart attack. In 2008 and 2009, the defendant's service manager, Mike Gildemeister, and the company's president, Mike Egan, completed performance reviews for the plaintiff in which they described his attendance as "marginal." Def. PFOF ¶¶ 62–63. In 2010, the plaintiff completed a self-evaluation in which he characterized his

---

[1] I use the words such as "unplanned" or "unexpected" to denote days on which the plaintiff was absent from work but did not give the defendant more than a few hours' notice of the absence. Thus, absences for planned vacations or scheduled doctor's appointments would not be unplanned or unexpected absences.

Case 2:15-cv-00059-LA   Filed 12/09/16   Page 3 of 28   Document 61

"attendance/punctuality" as "below expectations."  Yvonne Egan Decl. Ex. 1.  It appears that the plaintiff's absences through about 2010 may have been associated with his anxiety and depression, which at that point were undiagnosed.  In 2009, Mike Egan noticed that the plaintiff seemed depressed, and he suggested that the plaintiff consider seeing a therapist.  The plaintiff did start seeing a therapist in 2009 or 2010.  Kazmierski Dep. at 43.  However, as noted above, the plaintiff's need for a large number of sick days continued through the end of his employment.  By 2011 or 2012, Mike Egan implemented a policy under which the plaintiff was required to report the need for an unplanned sick day directly to him.  Kazmierski Dep. at 40, 87–88.  Egan felt that if the plaintiff were required to report his sick days directly to the company president, he would be less likely to call in sick.  M. Egan Decl. ¶¶ 8–9.

The defendant contends that, by July 2013, Egan was concerned with how the plaintiff's absences were affecting the company.  Def. PFOF ¶ 108.  Egan did not have a problem with any of the plaintiff's scheduled absences, such as planned vacations and other days on which the plaintiff reported in advance that he would be absent to deal with a medical issue.  This was because if the absence was planned the company could prepare for it.  Egan Dep. at 62.  The plaintiff's regular visits with his psychiatrist and therapist were of the "planned" variety, and the company did not have any difficulty accommodating those.  Pl. PFOF ¶ 54; Decl. of Michael Gildemeister ¶ 8.  What Egan was concerned about was the plaintiff's unplanned absences—those in which he would call in to work to report an absence between 7:00 a.m. or 8:00 a.m. on a day the company expected him to be at work.  These unplanned absences created a problem for the company because they would disrupt the schedule for the day.  By the time the plaintiff called in, the service manager would have already assigned the majority of the

work to be performed during the day to specific locksmiths. Gildemeister Decl. ¶¶ 9–10. Thus, when the plaintiff reported that he would be absent, the company would have to try to quickly reassign the service calls that had been assigned to the plaintiff to other locksmiths, who themselves were already scheduled to be performing their own service calls, or to find some other way to handle the work that had been assigned to the plaintiff. *Id.* ¶¶ 9–12. Mike Egan described the problem as involving a "mad scramble to come up with a solution to service all of our customers." Egan Dep. at 61. At his deposition, Egan described this "mad scramble" as follows:

> It might be that myself or [Mike Gildemeister, the service manager] had to go and do the job or a job. It might be that the electronics technicians and whomever else's schedule had to be rearranged. Unfortunately, some customers are typically—they are typically mad if we have to reschedule them. We would try and triage the day as quickly as possible, to decide what the best plan of attack would be, and that would usually require overtime on most everyone's part when someone calls in sick.

*Id.*

On July 15, 2013, the plaintiff unexpectedly called in sick and reported to the service manager that he had "tweaked his back." Kazmierski Dep. at 129–30; Gildemeister Decl. ¶ 17. The plaintiff's pain was apparently caused by his herniated discs.[2] To report this absence, the plaintiff called Mike Gildemeister, the service manager. Gildemeister Decl. ¶ 17. Gildemeister then reminded the plaintiff that he was supposed to report his absence directly to Mike Egan. *Id.* However, the plaintiff did not

---

[2] A clinical note in the plaintiff's medical records indicates that, on July 15, 2013, the plaintiff was experiencing tailbone pain and also "[n]ew low back pain." ECF No. 49-3 at p. 58–59. A clinical note dated July 18, 2013 reflects that the plaintiff reported that his "pain associated with the disc issue is gone," but that the tailbone pain continued. *Id.* at p. 71. Based on these notes, I will assume that a reasonable jury could find that the "new low back pain" that the plaintiff experienced on July 15 was caused by his herniated discs.

5

contact Egan to report the absence. Egan Dep. at 139:10–13; M. Egan Decl. ¶ 21. But at some point during the day, Gildemeister informed Egan that the plaintiff had called in because of back pain and was seeking medical treatment.

When the plaintiff saw his doctor on July 15, 2013, the doctor ordered an MRI. The doctor also faxed a note to Bonafide excusing the plaintiff from work from July 15 to July 17, 2013. The doctor's note explained that the reason for the absence was a "medical illness." ECF No. 49-3 at p. 76.

On July 18, the plaintiff's doctor entered a clinical note stating that the MRI results did not show any abnormalities and that the plaintiff could return to work. ECF No. 49-3 at p. 71. The plaintiff reported to work on July 18. However, when he arrived, Mike Egan sent him home because the plaintiff did not have a note from his doctor clearing him to return to work. On that same day, Mike Egan told the plaintiff that he was going out of town, that the plaintiff should "take the week off," and that he would discuss the plaintiff's employment at Bonafide when he returned. Later that day, the plaintiff's doctor faxed a note to Bonafide stating that the plaintiff could return to work with no restrictions. However, the plaintiff continued to remain at home pursuant to Mike Egan's instructions.

After July 18, the plaintiff and Egan had two in-person conversations and spoke on the phone more than once. During the second of these in-person conversations, Egan and the plaintiff discussed a variety of topics but focused on whether the plaintiff could satisfactorily perform the job of a locksmith service technician given the various problems that were causing his attendance to be unreliable, including his "health issues," his dog, and "problems he had been having with his wife." Egan Dep. at 104–05. The parties also discussed the fact that the plaintiff's heart attack had "messed with

6

[his] head tremendously," and that his psychiatrist had recently adjusted his anxiety and depression medication. Kazmierski Decl. ¶ 22. Egan also informed the plaintiff that "it [was] just too much" for the company to have to continuously make changes to its schedule when the plaintiff called in sick shortly before 8:00 a.m. Egan Dep. at 105.

During one of their conversations, Mike Egan told the plaintiff that "everyone" at the company was putting pressure on him to terminate his employment. Egan Dep. at 101. Apparently, Egan was referring to the fact that least three employees at Bonafide wanted the plaintiff "gone" because "they were tired of having to pick up the extra work" caused by the plaintiff's absences. Kazmierski Dep. at 256:9–25. The plaintiff then asked Egan whether he should write a letter to the other employees to explain why he was absent so frequently. Egan told the plaintiff that the letter "couldn't hurt," and that the company was a family and the decision whether to terminate him would be a "group decision." Egan Dep. at 102. The plaintiff decided to write the letter, and on July 29, 2013, he sent an email to all of Bonafide's employees. The plaintiff began the email by acknowledging that there were "a lot of hard feelings" towards him because of his "attendance issues." ECF No. 50-4 at p. 1. The plaintiff apologized for "put[ting] an extra work load on each and every" other employee. *Id.* The plaintiff then wrote several paragraphs about how his heart attack had affected him. The plaintiff explained that the heart attack led to his anxiety and depression, and that he was under the care of a psychiatrist and therapist and was taking medication. The plaintiff stated that, in the past year, his anxiety and depression had gotten better, and he asked the employees to understand that he was trying hard not to miss work. In this email, the plaintiff did not mention a back problem, his herniated discs, or his sinusitis.

7

On August 2, 2013, Egan and the plaintiff spoke by telephone. According to the plaintiff's recollection of this conversation, Egan told the plaintiff that in order to continue working at Bonafide he would have to draft his own letter of resignation, which Bonafide would consider tendered in the event that the plaintiff "ever miss[ed] another day of work due to an illness or anything pertaining to that." Kazmierski Dep. at 105–06. The plaintiff refused to draft his own letter of resignation because he could not guarantee that one of his "sicknesses" would not keep him out of work one day. *Id.* at 204–05. In the plaintiff's mind, his "sicknesses" included his back, sinusitis, anxiety, depression, and anything else. *Id.* at 205:2–6. According to the plaintiff, he told Egan during this conversation that he could not guarantee that his "disabilities" would not cause him to miss work or that he would never have to leave work early for a doctor's appointment. *Id.* at 254; Kazmierski Decl. ¶ 28. However, according to Egan, the plaintiff never mentioned during this conversation that he would likely need to miss work from time to time to deal with flare ups associated with his herniated discs, sinusitis, anxiety, or depression. M. Egan Decl. ¶ 27.

When the plaintiff refused to draft his own letter of resignation, Egan terminated his employment. Egan testified at his deposition that his primary reason for terminating the plaintiff was his "inability to be at work reliably and regularly." Egan Dep. at 118. Egan states in his declaration that his decision to terminate the plaintiff was not based on his sinusitis, anxiety, depression, or herniated discs. Egan Decl. ¶ 29.

## II. DISCUSSION

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "Discrimination," for purposes of § 12112(a), includes "not making reasonable accommodations to the

8

known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To establish a claim under the ADA, a plaintiff must show that he is a "qualified individual." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

The plaintiff contends that, as of August 2013, he could have continued to perform the essential functions of his locksmith position if Bonafide would have allowed him to take intermittent sick leave whenever he experienced a "flare up" associated with the medical conditions that the parties agree are disabilities within the meaning of the ADA—his herniated discs, sinusitis, anxiety, and depression. The plaintiff contends that allowing him intermittent leave would have been a reasonable accommodation to which he was entitled under the ADA. Therefore, the plaintiff argues, by conditioning his future employment on his agreeing to never take another unexpected sick day, Bonafide effectively terminated him on the basis of his disability, in violation of the ADA.

Before going further, I note that the plaintiff claims that his four disabilities required him to take "up to five" unexpected absences per month, *see* Br. in Opp. at 16, yet his actual attendance record suggests that his disabilities did not cause him to take nearly that many sick days per month. As described above, in the last 2½ years of his employment at Bonafide, the plaintiff was unexpectedly absent 36 times. However, the only absence that the plaintiff connects to a disability is the last absence, which a

9

reasonable jury could find was caused by a flare-up of his herniated discs.[3]   The rest of his absences were related to matters such as the flu, a cough, bronchitis, gastro-intestinal issues, eye pain, colitis, a dental emergency, and a vet emergency.   The plaintiff does not contend that any of these matters were connected to his herniated discs, sinusitis, anxiety, or depression.[4]   Thus, judging by the plaintiff's attendance record, the four disabilities involved in this case did not require the plaintiff to take more than five unexpected sick days per year.   And because Bonafide already provided the plaintiff with five paid sick days per year, it appears that the plaintiff could have performed the essential functions of his job without a reasonable accommodation.

If the plaintiff did not require more than five sick days per year to deal with flare-ups of his disabilities, then if Bonafide terminated him because of his attendance record, it would not have violated the ADA.   That is because the ADA did not require Bonafide to accommodate the plaintiff's need for additional sick leave to deal with things such as

---

[3] The record indicates that, in 2009, the plaintiff was unexpectedly absent for one five-day period due to symptoms caused by his sinusitis.   *See* ECF No. 49-1 at p. 40. However, as far as the record reveals, no other absences were related to his sinusitis. (The plaintiff does not contend that when he was absent because of a cold or the flu, he was experiencing a flare-up of his sinusitis.)   The record also indicates that, in 2011, the plaintiff gave Bonafide a letter from one of his medical providers stating that he would need "periods of 2–3 days off intermittently throughout the year for medical care" associated with his "significant anxiety disorder, as well as coronary artery disease."   *Id.* at p. 51.   However, no evidence suggests that, at any time between 2011 and his termination in 2013, the plaintiff actually needed to intermittently take days off because of his anxiety or his heart disease, other than for his planned therapy appointments. And the plaintiff does not contend that his heart disease is a disability at issue in this case.

[4] In the email he wrote to his coworkers, the plaintiff stated that his medication for his heart condition lowered his immune system.   *See* ECF No. 50-4 at p.1.   However, the plaintiff does not contend in this suit that any absences caused by a cold, the flu, or similar illnesses are attributable to his heart condition.   And, as I have already noted, the plaintiff does not contend that his heart condition is a disability at issue in this case.

colds, the flu, and vet emergencies, which were not related to his disabilities.[5]  Viewed this way, the "but for" cause of the plaintiff's termination would be his excessive absences during the last few years of his employment rather than his disabilities, and thus the plaintiff's disabilities would not have been the cause of his termination.  *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015).[6]

The plaintiff disputes that he was terminated because of his absenteeism—whether such absenteeism was caused by his disabilities or not—and contends that instead he was terminated simply because he was disabled.  Pl.'s Br. in Opp. at 23–29.  The plaintiff contends that several facts support this conclusion: (1) the defendant's stated reason for terminating him (his absenteeism) appears pretextual; (2) the timing of the termination was suspicious, in that he was terminated shortly after he experienced a flare-up of his herniated discs; and (3) Mike Egan took the "anti-disability, discriminatory animus" of the plaintiff's coworkers into account in making the decision to terminate his employment.  However, I conclude that the plaintiff's evidence is insufficient to allow a reasonable jury to conclude that the plaintiff was terminated for any reason other than his absenteeism.

---

[5] The parties agree that Bonafide did not have enough employees to fall within the scope of the Family and Medical Leave Act ("FMLA").  Stipulated Facts ¶ 10.  Thus, to the extent that any of the plaintiff's absences were related to "serious health conditions" under the FMLA, *see* 29 U.S.C. § 2612(a)(1), Bonafide was not required to provide the plaintiff with intermittent leave to deal with them.

[6] The plaintiff does not contend that the 2008 amendments to the ADA, which changed the statutory language from prohibiting discrimination "because of" a disability to prohibiting discrimination "on the basis of" a disability, affects the standard required to prove causation in this case.  Thus, I do not address that question.  *See Hooper*, 804 F.3d at 853 n.2; *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 287 n.3 (7th Cir. 2015).

11

First, nothing suggests that Bonafide's reliance on the plaintiff's absenteeism is a mere pretext. As discussed below in the context of addressing whether Bonafide could have reasonably accommodated the plaintiff's absenteeism, the evidence shows that the plaintiff's frequent unexpected absences interfered with the company's operations by making it difficult for the company to respond to customer service calls. The plaintiff contends that this reason appears pretextual because Bonafide never disciplined him for his absences until he experienced a flare-up of his back disability. It is true that, prior to the plaintiff's termination, Bonafide never formally disciplined him because of his absences. However, this does not mean that Bonafide never considered the plaintiff's absences to be a problem. To the contrary, in 2008 and 2009, the plaintiff received performance reviews that described his attendance as "marginal." Def. PFOF ¶¶ 62–63. In 2010, the plaintiff completed a self-evaluation in which he characterized his "attendance/punctuality" as "below expectations." Y. Egan Decl. Ex. 1. The fact that the plaintiff recognized that his attendance was below expectations implies that someone at Bonafide had told him that his attendance was a problem. Moreover, by 2011 or 2012, Mike Egan took action to try to reduce the number of the plaintiff's absences by requiring the plaintiff to report his sick days directly to him. Kazmierski Dep. at 40, 87–88; M. Egan Decl. ¶¶ 8–9. Although this action may not have amounted to formal discipline, it surely indicated that the company thought that the plaintiff's absenteeism was a problem. Thus, the fact that the plaintiff was not formally disciplined for his absences until he experienced a flare-up up of his back disability does not support the conclusion that Bonafide's reliance on his absenteeism is pretextual.

For similar reasons, the timing of the plaintiff's termination does not appear suspicious. Yes, the termination occurred on the heels of an absence caused by the

plaintiff's back disability, but that absence was simply the latest in a long string of unexpected absences, many of which had no apparent connection to his disabilities. By the time the plaintiff needed an absence to deal with his back disability, Bonafide had already told him that his attendance was below expectations, and it had set up a special procedure—the requirement that he report his absences to Egan—that was designed to discourage him from calling in sick. Yet the plaintiff continued to have a high number of unexpected absences, leaving Bonafide with few options other than to continue tolerating his absences or to terminate his employment. When the plaintiff called in the final time, Bonafide decided that it could no longer tolerate his absenteeism and decided to terminate his employment. The plaintiff's argument that it was really his back disability rather than his history of absenteeism that caused his termination implies that Bonafide had no problem allowing the plaintiff to be unexpectedly absent as much as he wanted for other reasons, but could not tolerate absences related to his back disability. But all of the evidence makes clear that it was the absences themselves, rather than the reasons for them, that prompted the plaintiff's termination.

The plaintiff also contends that Bonafide's reason for terminating him appears pretextual because Egan noted during his deposition that terminating the plaintiff would only make it more difficult for Bonafide to service its customers, since at the time of the plaintiff's termination Bonafide was already shorthanded. *See* Egan Dep. at 113:20–23. Thus, the argument goes, Bonafide's reason for terminating him couldn't really be that his absences were making it hard for Bonafide to service customers. However, although terminating the plaintiff might result in the remaining locksmiths having more work to do, Bonafide would no longer have to worry about scrambling to reassign work that had been assigned to the plaintiff when he called in sick. Thus, even though

13

everyone would have more work to do, they could perform their work more efficiently. Moreover, even if terminating the plaintiff meant that the remaining locksmiths had more work to do in the short run, Bonafide could eventually hire a new locksmith with reliable attendance to fill the plaintiff's position, whereas the plaintiff's need for frequent unexpected leave would have been indefinite. Thus, the fact that Bonafide was already shorthanded when it terminated the plaintiff does not suggest that Bonafide's reason for terminating him was pretextual.

The plaintiff's argument regarding Bonafide's taking his coworker's discriminatory animus into account is based on comments the coworkers made after the plaintiff sent the email in which he explained that his absences were related to his heart disease, anxiety, and depression. According to Mike Egan, some coworkers referred to the plaintiff's email as "[m]ore of the same blah-blah-blah that everyone had been putting up with for years in regards to [the plaintiff]." Egan Dep. at 113:4–17. Egan also said that "most of them didn't want to put up with it any longer." *Id.* Because Egan testified that he told the plaintiff that the decision to terminate him would be a "group decision," Egan Dep. at 102:9–11, I assume that Egan took the views of these coworkers into account when deciding whether to terminate his employment. Thus, I assume that if the coworker's comments reflected discriminatory animus, they would support a jury's finding that the plaintiff was terminated because of that animus, rather than because of his absenteeism.

It is true that the plaintiff's coworkers' comments suggest that they did not think much of his explanation for his absences, and perhaps the comments also suggest that the coworkers thought the plaintiff was too quick to blame his absenteeism on his medical problems. However, the comments do not suggest that the coworkers wanted

the plaintiff terminated simply because he was disabled. Rather, as the plaintiff himself admits, his coworkers wanted him terminated because they were "tired of picking up the extra work" caused by his absenteeism. Kazmierski Dep. at 256:23–25. Now, as I discuss in more detail below, the plaintiff's coworkers' not wanting to absorb the plaintiff's work might not be a reason to deny him a reasonable accommodation if his disabilities were the cause of the absenteeism. But their not wanting to absorb the work does not imply that they were biased against him because he was disabled, rather than because his absences required them to take on extra work. Thus, the evidence relating to the coworkers' comments does not suggest that the plaintiff was terminated because of discriminatory animus, rather than because of his absenteeism.

So far, I have assumed that the plaintiff's disabilities did not require him to be unexpectedly absent from work more than five times per year, and that therefore, even though he was disabled, he could have performed the essential functions of his job without a reasonable accommodation. However, as noted, the plaintiff contends that his disabilities required him to be absent from work "up to five times per month," and that therefore he needed a reasonable accommodation. Pl.'s Br. in Opp. at 16. The plaintiff contends that this is supported by a form that his doctor provided to his subsequent employer on April 7, 2015, in connection with the Family and Medical Leave Act. *See* ECF No. 49-3 at pp. 77–80. In this form, the plaintiff's doctor states that "flare ups" associated with the plaintiff's herniated discs, sinusitis, anxiety, and depression can be expected to require the plaintiff to miss five days of work per month. *Id.* As I noted above, the plaintiff's actual attendance record at Bonafide does not suggest that, as of August 2013, the plaintiff's disabilities required him to take this many sick days. However, as discussed below, Bonafide would be entitled to summary judgment even if

15

a reasonable jury could find that, at the time of his termination, the plaintiff's disabilities required him to take up to five unexpected absences per month.

An initial question is whether the plaintiff requested a reasonable accommodation of his herniated discs, sinusitis, anxiety, and depression. "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). After an employee requests a reasonable accommodation, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). If this interactive process breaks down before a reasonable accommodation is identified, then the court must assign fault for the breakdown. *See, e.g., Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996). If the employee is responsible for the breakdown, then the employer is not liable under the ADA. If the employer is responsible for the breakdown, then it may be liable under the ADA. However, even if the employer is responsible for the breakdown, the employer is not liable unless the employee proves that he was able to perform the essential functions of the job with an accommodation. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013).

The parties do not dispute that Bonafide was aware that the plaintiff suffered from herniated discs, sinusitis, anxiety, and depression. Bonafide also concedes that it was aware that the plaintiff's anxiety and depression required him to occasionally miss work to attend therapy appointments, and that it could have reasonably accommodated his absences for therapy because they were planned absences. However, Bonafide contends that the plaintiff never informed it that his four disabilities were responsible for

16

his unplanned absences or told it that those disabilities would require him to take up to five unexpected absences per month.  Bonafide thus argues that the plaintiff failed to request an accommodation of those disabilities, and that therefore it cannot be liable for failing to provide such an accommodation.

The defendant's argument has some merit.  The plaintiff never explicitly asked Bonafide to accommodate his four disabilities by providing him with additional sick days, and he never made clear that the sick days he had taken in the last 2½ years of his employment were caused by those four disabilities.  On the other hand, Bonafide was aware of the plaintiff's disabilities and that they would occasionally require him to be unexpectedly absent from work, and the plaintiff's email to his coworkers seemed to attribute many of the absences to his anxiety and depression.  This raises the question of whether, under the interactive process, Bonafide had a duty to inquire whether many or all of the plaintiff's absences were caused by his disabilities.  Further, when Egan told the plaintiff that if he wanted to continue working at Bonafide he would have to agree to never be unexpectedly absent again, the plaintiff responded by informing Egan that he could not guarantee that he would not have another absence due to his "disabilities." Kazmierski Decl. ¶ 28.  Although the plaintiff did not in this conversation specifically identify what his disabilities were, a reasonable jury could conclude that the plaintiff's mentioning his "disabilities" triggered Bonafide's duty under the interactive process to investigate further and determine whether the plaintiff's herniated discs, sinusitis, anxiety, or depression required him to take a significant amount of unexpected leave, and whether Bonafide could reasonably accommodate the plaintiff's need for that leave. Thus, for purposes of this motion, I assume that the plaintiff requested a reasonable

accommodation of his four disabilities, and that Bonafide was responsible for the breakdown of the interactive process.

However, as noted, an employer who is responsible for a breakdown of the interactive process is not liable under the ADA unless the employee proves that he could have performed the essential functions of his job with a reasonable accommodation. In other words, the plaintiff must prove that had the employer engaged in the interactive process, a reasonable accommodation would have been identified. If no reasonable accommodation was possible, then the breakdown of the interactive process would be "academic." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). Thus, I turn to the question of whether the plaintiff has shown that he could have performed the essential functions of his job if Bonafide had granted him a reasonable accommodation.

The plaintiff contends that had Bonafide properly engaged in the interactive process, it would have eventually learned that he needed an accommodation that consisted of "up to five [unplanned] absences per month (for all four disabilities) and time off for therapy appointments." Pl.'s Br. in Opp. at 16. Because Bonafide was willing to provide the plaintiff with time off for planned therapy appointments, the question is whether a reasonable jury could find that Bonafide was required to also provide the plaintiff with up to five unplanned absences per month as a reasonable accommodation. I conclude that it could not.

The Seventh Circuit has repeatedly stated that the ADA does not require an employer to accommodate "erratic or unreliable attendance." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489–90 (7th Cir. 2014); *Basden*, 714 F.3d at 1037; *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950 (7th Cir. 2001); *Jovanovic*,

18

201 F.3d at 899; *Waggoner v. Olin Corp.*, 169 F.3d 481, 484–85 (7th Cir. 1999); *see also Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 602 (7th Cir. 1998) (noting that "excessive frequency of employee's absences in relation to that employee's job responsibilities" may "lead to a finding that an employee is unable to perform the duties of his job").  Although the court has explained that the issue of whether a plaintiff's absences could be reasonably accommodated is normally a question of fact for the jury, *Haschmann*, 151 F.3d at 602, in the present case, a jury could not reasonably conclude that up to five unanticipated absences per month was reasonable, given the essential functions of the plaintiff's job.

An essential function of the plaintiff's job was to make service calls at customer locations to service or install locks and related equipment.  M. Egan Decl. ¶ 4.  As one might expect, many of these service calls involved emergencies and last-minute requests for service.  *Id.* ¶¶ 3, 7, 23.  To perform this work, Bonafide needed its locksmiths to attend work reliably and predictably.  *Id.* ¶ 7.  As Bonafide's service manager explains in his declaration, anytime a locksmith calls in sick unexpectedly, the company's operations are disrupted.  Gildemeister Decl. ¶¶ 9–12.  The service manager spends most of his day arranging service calls for locksmiths for the following day.  If on the following day a locksmith unexpectedly calls in sick, then the service manager would have to "scramble" to reassign the scheduled work.  *Id.* ¶ 10.  Reassigning the work would be particularly difficult if the employee did not report his absence until shortly before 8:00 a.m., because by 8:00 a.m. the remaining locksmiths would already be on their way to other jobs.  In addition, Bonafide's policy was to provide same-day service to any customers who called to request service before noon.  Thus, when Bonafide was short a locksmith, not only would the remaining locksmiths have to absorb the

19

scheduled work that had already been assigned to the absent locksmith, but there would be one less locksmith to handle any calls for same-day service. All of this disruption often resulted in Bonafide paying overtime to the remaining locksmiths, or to the service manager, who had to work extra hours to make up for the time he spent rearranging the schedule. *Id.* ¶ 12. If Bonafide could not assign the absent locksmith's work to another locksmith, it would have to reschedule the customer's appointment. The service manager states that often customers would be upset when their appointments were rescheduled, and he reports that "several residential customers cancelled their appointments with Bonafide due to [the plaintiff's] absences." *Id.* ¶ 11.

Given the nature of the plaintiff's job and Bonafide's business, it is clear that requiring Bonafide to tolerate up to five unanticipated absences per month—or about one absence per week—would be unreasonable. Each unanticipated absence put a strain on the company, and although the company could likely have accommodated a smaller number of absences, such as the five sick days per year it already provided the plaintiff, up to five each month was simply too many. Perhaps up to five unexpected absences per month could be a reasonable accommodation for an employee whose job does not involve time-sensitive work or keeping customer appointments, so long as the employee is otherwise able to perform the essential functions of the job. An example would be the accommodation that Bonafide provided to Yvonne Egan, who performed administrative work, which I discuss in more detail below. But for a locksmith, whose essential functions involve keeping customer appointments and assisting them with emergencies, up to five unexpected absences per month is not a reasonable accommodation. *See Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994) (finding that employer is not required to accommodate unpredictable absences that

required the employer to make "last-minute provisions for [the employee's] work to be done by someone else.").

The plaintiff contends that, for several reasons, the jury could reasonably conclude that Bonafide was required to accommodate his need for up to five absences a month. First, he points out that Bonafide employed a number of other employees who had the skills necessary to cover for him when he was absent. Although it is true that Bonafide employed other locksmiths, this misses the point, which is that the unanticipated nature of plaintiff's absences made it difficult to reassign his work to those employees in an orderly fashion. As discussed above, on the days when the plaintiff called in sick, Bonafide's other locksmiths were already scheduled to be performing other work. When the plaintiff called in, the service manager had to quickly reassign the plaintiff's work to the other locksmiths or reschedule or cancel customer appointments, as Bonafide did not have idle locksmiths that it could call on in the event of an unanticipated absence.[7] The need to quickly rearrange the schedule resulted in a general disruption to the company's operations, customer dissatisfaction, lost business, and overtime compensation, and the plaintiff does not point to evidence suggesting that this general disruption did not occur.[8] Thus, the mere fact that Bonafide employed

---

[7] Bonafide could call on its retired former owner, as well as a part-time employee named Tom Mueller, to perform service calls when needed. However, the evidence in the record is that Bonafide's former owner and Mr. Mueller could usually fill in only when they had advance notice, such as to cover for a locksmith's planned vacation or planned medical leave of absence. M. Egan Decl. ¶ 11; Egan Dep. at 159:21–160:16.

[8] The plaintiff notes that the defendant does not submit evidence establishing the cost of the overtime it paid to other employees to make up for his absences. Pl.'s Br. in Opp. at 21. However, the plaintiff does not point to evidence suggesting that Bonafide did not pay overtime to the employees who covered for his absences, that Bonafide did not have to scramble to reassign his service calls, or that the plaintiff's absences did not cause Bonafide to lose business. Thus, I consider the defendants' evidence on these matters undisputed.

21

others who possessed the same skills as the plaintiff does not imply that Bonafide could reasonably accommodate the plaintiff's need for up to five unplanned absences per month.

The plaintiff also contends that Bonafide could have accommodated his need to be unexpectedly absent because the defendant was constantly rearranging its schedule "based on customer needs." Pl.'s Br. in Opp. at 20. The plaintiff seems to be arguing that because tending to the last-minute needs of its customers already required Bonafide to rearrange its schedule, it was reasonable for Bonafide to also have to rearrange its schedule whenever the plaintiff needed to be unexpectedly absent. However, the fact that Bonafide's business required it to rearrange its schedule at the last minute actually undermines the plaintiff's argument for an accommodation rather than supports it. As noted above, when the plaintiff was unexpectedly absent, Bonafide had one less locksmith available than it thought it would, and thus the plaintiff's absences left Bonafide less able to handle its customer's last-minute calls.

Next, the plaintiff contends that a jury could infer that his needed accommodation was reasonable because Bonafide allowed other employees to take extensive leaves of absence for medical reasons. He first points to Yvonne Egan, who Bonafide allowed to work a flexible schedule to accommodate her multiple sclerosis. However, Yvonne Egan is not a locksmith and does not perform service calls. She is the company's vice president and performs administrative duties, including human-resources functions and recordkeeping. Decl. of Y. Egan ¶¶ 2–4. This work is not as time-sensitive as locksmith work, and the fact that Bonafide was able to accommodate her need for unanticipated leave does not imply that it could have reasonably accommodated a locksmith's need for unanticipated leave. The plaintiff also points to medical leave taken by Mike

22

Gildemeister, the service manager, and two other locksmiths. However, these employees required periods of leave to deal with temporary medical conditions; they did not have an ongoing need to be able to call in sick on short notice, as did the plaintiff. Pl. PFOF ¶¶ 79–80. For the most part, Bonafide was able to accommodate these employees by arranging in advance to have other employees work in their place. Egan Dep. 160:5–13. To the extent that these employees unexpectedly required intermittent leave, which would have resulted in the same "mad scramble" as the plaintiff's unexpected absences, no evidence suggests that their need for unexpected leave was permanent or long-lasting, as was the plaintiff's need for such leave.[9] Thus, the fact that Bonafide was able to temporarily accommodate these employees does not imply that it could have reasonably accommodated the plaintiff's ongoing need for a substantial amount of unexpected leave each year.

Finally, the plaintiff contends that the only burden that his unexpected absences caused Bonafide was "to upset employee morale." Br. in Opp. at 20. In referring to employee morale, the plaintiff means "the general discontentment of other employees, including [the service manager], who created the daily schedule, and employees who had to cover for [the plaintiff] in his absence." *Id.* The plaintiff contends that the negative impact of his absences on the morale of his coworkers is not a legitimate factor to consider when deciding whether an accommodation is reasonable or imposes an undue hardship. He cites the EEOC's enforcement guidance on reasonable accommodations and undue hardship, which states that an employer cannot claim an

---

[9] Initially, Gildemeister needed leave "sporadically" to deal with a shoulder injury. He then had surgery to fix the problem and took a continuous period of leave for rehabilitation. Pl. PFOF ¶ 79. It thus appears that Gildemeister's need for sporadic leave was only temporary.

undue hardship based on either its employees' fears or prejudices towards the individual's disability, or because making a reasonable accommodation for the individual that involves transferring some of the individual's marginal functions to coworkers makes the coworkers unhappy.[10]

---

[10] The EEOC enforcement guidance provides in relevant part as follows:

> An employer cannot claim undue hardship based on employees' (or customers') fears or prejudices toward the individual's disability. Nor can undue hardship be based on the fact that provision of a reasonable accommodation might have a negative impact on the morale of other employees. Employers, however, may be able to show undue hardship where provision of a reasonable accommodation would be unduly disruptive to other employees' ability to work.

> *Example A*: An employee with breast cancer is undergoing chemotherapy. As a consequence of the treatment, the employee is subject to fatigue and finds it difficult to keep up with her regular workload. So that she may focus her reduced energy on performing her essential functions, the employer transfers three of her marginal functions to another employee for the duration of the chemotherapy treatments. The second employee is unhappy at being given extra assignments, but the employer determines that the employee can absorb the new assignments with little effect on his ability to perform his own assignments in a timely manner. Since the employer cannot show significant disruption to its operation, there is no undue hardship.

> *Example B*: A convenience store clerk with multiple sclerosis requests that he be allowed to go from working full-time to part- time as a reasonable accommodation because of his disability. The store assigns two clerks per shift, and if the first clerk's hours are reduced, the second clerk's workload will increase significantly beyond his ability to handle his responsibilities. The store determines that such an arrangement will result in inadequate coverage to serve customers in a timely manner, keep the shelves stocked, and maintain store security. Thus, the employer can show undue hardship based on the significant disruption to its operations and, therefore, can refuse to reduce the employee's hours. The employer, however, should explore whether any other reasonable accommodation will assist the store clerk without causing undue hardship.

EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *28–29 (October 17, 2002) (footnotes omitted).

24

As I discussed above, there is no evidence that the plaintiff's coworkers harbored fears or prejudices towards the plaintiff because of his disability. Rather, the employees who wanted the plaintiff terminated were "tired of having to pick up the extra work" caused by his many absences, whether disability-related or not. Kazmierski Dep. at 256:14–25. Of course, the EEOC guidance provides that a coworker's unhappiness over having to perform some of a disabled employee's marginal functions is not a reason that supports denial of the reasonable accommodation, so long as the employer determines that the coworker can absorb the extra work without disrupting the company's operations. But, in the present case, when the plaintiff was unexpectedly absent, his coworkers had to perform the essential functions of his job—i.e., all of the service calls that he had been assigned for the day that could not be rescheduled—not just some of his marginal functions. Moreover, as discussed above, Bonafide determined that the plaintiff's coworkers could not absorb the plaintiff's work at the last minute without disrupting operations. Again, the undisputed evidence shows that when the plaintiff called in sick, Bonafide had to scramble to reassign or reschedule his service calls, which resulted in customer dissatisfaction, customer cancellations, and overtime. Thus, although Bonafide could not have refused to provide the plaintiff with an accommodation simply because his coworkers did not want to do extra work that they could absorb, here the only reasonable conclusion that can be drawn from the record is that the plaintiff's coworkers could not absorb the extra work without disrupting Bonafide's operations. Thus, Bonafide did not impermissibly terminate the plaintiff on the basis of his coworker's attitudes.

In his brief, the plaintiff contends that even if his preferred accommodation (up to five unexpected sick days per month) was not reasonable, it is possible that had

Bonafide engaged in the interactive process, it would have identified some alternative reasonable accommodation. Br. in Opp. at 21–23. However, the plaintiff does not identify any alternatives to his request for a substantial amount of unanticipated leave. *See id.* The plaintiff does not, for example, contend that he could have been transferred to a different position, such as an office position similar to Yvonne Egan's, in which he could have performed the essential functions of the job even if he took up to five unexpected absences per month. Thus, the plaintiff has failed to carry his burden of showing that, had Bonafide properly engaged in the interactive process, some reasonable accommodation would have been identified. S*ee Basden*, 714 F.3d at 1039.

One additional quirk in this case is that Egan did not just terminate the plaintiff's employment because of his absenteeism, but also because the plaintiff refused to draft his own resignation letter, which, according to the plaintiff, Egan would have considered tendered in the event that the plaintiff "ever miss[ed] another day of work due to an illness or anything pertaining to that." Kazmierski Dep. at 105–06. Assuming as I must for purposes of summary judgment that the plaintiff's account of what Egan said during this conversation is true, then Egan would have conditioned the plaintiff's further employment on his never taking another sick day for any reason, including a reason associated with his disabilities. A question thus arises as to whether Egan's giving the plaintiff this ultimatum transformed the termination into one that violated the ADA. I conclude that it did not. As discussed above, as of August 2013 Bonafide could have terminated the plaintiff because of his excessive absences, which either were not caused by his disabilities or, if they were, could not be reasonably accommodated. But instead of just terminating the plaintiff outright, Egan conditioned the plaintiff's continued

employment on his agreeing (in the form of the resignation letter) that any additional unexpected absences would result in termination.  If these were the actual terms of the deal, then of course the plaintiff could not agree to it, because no person, whether disabled or not, can guarantee that he or she will never need to call in sick.  Essentially, then, Egan's conditioning the plaintiff's further employment on his agreeing to never call in sick had the same effect as a termination, in that Egan made the plaintiff an offer he knew he could not accept.  But because, as I have discussed, Bonafide was entitled to terminate the plaintiff's employment outright based on his absenteeism, Egan's asking the plaintiff to draft his own resignation letter, which had the same effect as a termination, did not result in a violation of the ADA. Egan's making this offer did not reflect animus against persons with disabilities.  Rather, the offer was essentially a gimmick to try to get the plaintiff to take his attendance more seriously.  Although the terms of the deal, if accepted, would have denied the plaintiff the accommodation he claims he needed (up to five sick days per month), as I have explained that accommodation was not reasonable.  Finally, although the offer may have caused a breakdown in the interactive process, the plaintiff has not identified any alternative accommodation that would have allowed him to perform the essential functions of his job.

One last issue is the plaintiff's motion to strike the defendant's response to his proposed findings of fact, which the defendant filed three days after the filing deadline. The defendant filed its reply brief on the filing deadline, which was a Friday, but, according to defendant's counsel, a filing error delayed the filing of its response to the proposed findings of fact until the following Monday.  The plaintiff does not contend that

the late filing caused him any prejudice, and the court was not prejudiced by the delay. Accordingly, I will not strike the defendant's response to the proposed findings of fact.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

**IT IS FURTHER ORDERED** that the plaintiff's motion to strike the defendant's response to the plaintiff's proposed findings of fact is **DENIED**.

Dated at Milwaukee, Wisconsin, this 9th day of December, 2016.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge